**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

S. RYAN STRAUSS,

     *v.*

THE CBE GROUP, INC. and

JOHN DOE,

     *Defendants*.

Case No. 15-62026-CIV-COHN/SELTZER

**RULE 26(a)(2)(b) WRITTEN REPORT OF JEFFREY A. HANSEN**

## EXPERT REPORT OF JEFFREY A. HANSEN

My name is Jeffrey A. Hansen. I am an adult over the age of 18, a resident of the state of California, and I reside at 2625 Kings View Circle, Spring Valley, CA 91977. Unless indicated otherwise, I have personal knowledge of each of the matters stated herein, and if called to testify I could and would testify competently about them.

I was asked to prepare this written expert report by Plaintiff's counsel in the above-captioned matter, Scott Ryan Strauss, in support of Plaintiff's Designation of Expert Witnesses Pursuant to Fed. R. Civ. P. 26(a)(2)(b).

I have been retained in this case at a rate of $300 per hour, for all services rendered, and $380 per hour for depositions.

*Experience and Credentials*.

I am the principal of Hansen Legal Technologies, Inc. My firm is in the business of handling Information Technology, including investigations and analysis of electronic data. I have served as an expert or consultant in more than 150 TCPA class action lawsuits, and as an expert or consultant in numerous other civil cases.

With regard to my experience as an expert and consultant in legal matters, generally, I have frequently served as an expert witness and consultant to law firms in conducting computer forensic analysis. I have also assisted in electronic discovery issues.

Specific to this case, my firm was retained to assist Plaintiff's counsel in evaluating and analyzing the telephone dialing system(s) used by The CBE Group, Inc. in placing telephone calls to Plaintiff. I have also been retained to assist Plaintiff and their counsel in evaluating and analyzing electronic data

2

related to outbound calls and other electronic data associated with computer systems and/or telephone dialing systems that may have been used by Defendant and/or its agents. In that respect, I have extensive experience with data warehousing, including data warehousing related to telemarketing and autodialers in general. I am familiar with the procedures involved in such practices, and I have personally engaged in data warehousing regarding the compilation of certain lists, including demographic and target audience lists for telemarketing, and have personally repaired defective lists to eliminate improperly formatted and corrupted data.

I also frequently act as a consultant to companies that engage in the use of autodialers, and I am familiar with their use and procedures, and the technical aspects of that business. In that capacity, I have assembled, configured, maintained, operated all aspects of autodialers, and interfaced with the telecommunications providers through whose networks the autodialers operate.

I have set up and maintained all aspects of predictive dialers and autodialers, from predictive dialers operating with just three telephone lines to outbound call centers capable of generating over 1 million calls per hour. When building these systems, I have used various software and hardware solutions for predictive and autodialers, both proprietary and open source, and customized those systems for their particular uses. I myself have used and maintained predictive and autodialers, and trained others to do the same.

Further, I am familiar with the manner in which outbound dial lists are used and maintained in the debt collection industry in which The CBE Group, Inc. operates. Similarly, I am familiar and have experience with, and know how to use, databases containing cell block identifiers and ported number lists, both of which identify cellular type telephone numbers and are typically used in these industries.

3

Over the last twenty-six (26) years, I have also had extensive experience in a broad range of other areas in the electronic and information technology fields and obtained many certifications such as MCP 4.0, A+, Network+, MCP 2000, MCSA, MCSE, Linux+, I-Net+, Security+, CIW Security Analyst.  From the hardware perspective, I have extensive experience in troubleshooting and repairing at the component level, and building various systems for various purposes. I have designed, built and maintained computer networks in a variety of environments from commercial businesses to very large DoD networks. I have taught approximately 1,000 others the skills to become computer network engineers themselves. I have had extensive experience in dealing with security breaches and hardening computer networks against those breaches.  I have handled many computer forensic and E-Discovery matters, including internal investigations in companies, working at the FBI sponsored Regional Computer Forensics Laboratory, and founding a computer forensics and E-Discovery firm over 8 years ago.  I have also had extensive experience with the set-up and use of predictive and auto dialers. (See Exhibit A – Resume of Jeffrey A. Hansen).

I have been called to testify in the following civil matters: *Craig Casey v. Valley Center Insurance Agency Inc.*, Case No. 37-2008-00004378-SC-SC-CTL (San Diego Superior Court); *Stemple v. QC Holdings, Inc.*, Case No. 12-CV-1997-CAB-WVG (S.D. Cal.); *Hahn v. Massage Envy Franchising*,  Case No: 3:12-cv-00153-DMS-BGS (S.D. Cal.), *Abdeljalil v. General Electric Capital Corporation*, Case No: 12-cv-02078-JAH-MDD (S.D. Cal.), *Jasminda Webb v. Healthcare Revenue Recovery Group, LLC* Case No: C 13-0737 JD (N.D. Cal.), *Balschmiter v TD Auto Finance, LLC,* Case No: 2:13-cv-01186 (E.D. Wisc.), *Jordan Marks v Crunch San Diego, LLC,* Case No. 14-CV-0348-BAS (BLM) (S.D.Cal.), *Peter Olney v Job.com*, Case No: 1:12-cv-01724-LJO-SKO (E.D. Cal.), *Carlos Guarisma v ADCAHB Medical Coverages, Inc. and Blue Cross and*

4

*Blue Shield of Florida, Inc.*, Case No: 1:13-cv-21016-JLK (S.D. Fla.), *Farid Mashiri v Ocwen Loan Servicing, LLC,* Case No: 3:12-cv-02838 (S.D. Cal.), *Monty J. Booth, Attorney at Law, P.S. v Appstack, Inc.*, Case No. 2:13-cv-01533-JLR (W.D. Wash.), *Rinky Dink, Inc. d/b/a Pet Stop v World Business Lenders, LLC,* Case No. 2:14-cv-00268-JCC (W.D. Wash.), *Michael Reid and Dave Vacarro v. I.C. Sytems, Inc*., Case No. 2:12-cv-02661-ROS (D. Ariz.), *Jeffrey Molar v NCO Financial Systems* Case No. 3:13-cv-00131-BAS-JLB (S.D. Cal.), *Latonya Simms v Simply Fashion Stores LTD, and ExactTarget, Inc.*, Case No. 1:14-CV-00737-WTL-DKL (D. Ind.), *Sueann Swaney v Regions Bank*, Case No. CV-13-RRA-0544-S (N.D. Ala.); *Hooker v SiriusXM,* Case No. 4:13-cv-00003 (AWA) (E.D. Va.), *Diana Mey v Frontier Communications*, Case No. 13-cv-01191-RNC (D. Conn.), *Rachel Johnson v Yahoo! Zenaida Calderin v Yahoo! Case* No. 14-cv-2028 14-cv-2753 (N.D. IL).

*Work and Analyses in this Case Regarding  Use of Automatic Telephone Dialing Systems*.

I have been retained in part to evaluate whether telephone dialing systems used by Defendant to place calls at issue in this case meet the definition of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227. ("TCPA"). The FCC defines an ATDS as follows:

> "The TCPA defines an 'automatic telephone dialing system' as 'equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.' The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an 'automatic telephone dialing system,' the equipment need only have 'the *capacity* to store or produce telephone numbers (emphasis added)'…."

5

(*See Exhibit B attached hereto - FCC Order 03-153 at ¶ 131-134*).

I have reviewed various documents and evidence from this case relating to Defendant's placement of telephone calls to Plaintiff's cellular telephone. Specifically, I have reviewed the following documents: 1) Exhibit B - FCC Order 03-153; 2) Exhibit C – Noble Systems - Management Desktop; 3) Exhibit D - Noble Systems - IVR; 4) Exhibit E - Noble Systems - Messaging; 5) Exhibit F - Noble Systems - Outbound; 6) Exhibit G - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1; 7) Exhibit H - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2;  8) Exhibit I - US patent 3,943,289; 9) Exhibit J - US patent 4,933,964;  10) Exhibit K - Noble TCPA Compliance Solution; 11) Exhibit L - ATDS and predictive dialers 1970-1992; 12) Exhibit M - Davox Marketing;  13) Exhibit N - US Patent 3229042;  14) Exhibit O - US Patent 3317678;  15) Exhibit P - CBE patent application;  16) Exhibit Q - Account Notes;  17) Exhibit R - Deposition transcript of Terry Johnson;  18) Exhibit S - Response from Livevox;  19) Exhibit T - FCC-15-72A1;  20) Exhibit U - FCC response to ACA.  Additionally, I have read Noble Systems predictive dialer manuals in numerous other matters, including *Almaraz v. CBE Group* Case No. 2:14-cv-00699-GMN-GWF (D. Nevada), and spoken with Noble Systems representatives when shopping for predictive dialers myself. While not produced yet in this case, I have reviewed The CBE Group's Manual for the clicker application manual in *Lucille Miller v The CBE Group* Case No. 3:15-cv-00033-JAJ-RAW (E.D. IOWA) and *Paul Stemple v The CBE Group* Case No. 5:15-CV-00279-VAP-KK (C.D. Cal).  I have also offered an opinion in the form of a written report on CBE Group's predictive dialing systems in *Almaraz v. CBE Group* Case No. 2:14-cv-00699-GMN-GWF (D. Nevada).  Also, in addition to this case, I have also reviewed deposition transcripts regarding CBE Groups

6

predictive dialing systems in *Lucille Miller v The CBE Group* Case No. 3:15-cv-00033-JAJ-RAW (E.D. IOWA) and *Linda Blair and Diane Deal v The CBE Group* Case No. 13-cv-134-MMA(WVG)(S.D. Cal).

I have reviewed a patent application for a clicker program, attached as Exhibit P - CBE patent application.

Based upon the review of the patent application for this "clicker" program, this program is not an ATDS by itself.  In fact, it is not a dialer. There is no evidence that this program is capable of placing a telephone call. It has no connection to any phone lines of any kind according to the patent application. My conclusion, this "clicker" application is not what was used to initiate the phone calls to the plaintiff.  This "clicker" application is no more than a common interface used by CBE for each of the dialers.  (*See Exhibit P - CBE patent application; Exhibit R - Deposition transcript of Terry Johnson p. 116:14-18*) The question of whether the system can automatically call a list of numbers has nothing to do with how the list of numbers was acquired or assembled, or in the case of the "Clicker" application, passing the phone numbers to the dialer.  This patent application only address the building of the list, by passing the phone numbers to the dialer, and nothing about how the list is called.  The patent application however does give clues that there is a system, apart from the "clicker" application that was used to initiate calls to the plaintiff's cellular phone, calling the a list that the "clicker" application was used to build.  The dialer that was used to initiate the calls is either the Noble Systems predictive dialer or the Livevox HCI dialer.  (Exhibit P - CBE patent application; *Exhibit R - Deposition transcript of Terry Johnson pp. 16:17, 19:22:24, 20:17-21, 22:4-12, 23:9-20, 25:25, 26:1-15, 61:4-5, 101:20-25, 102:1-2, 103, 10-25, 104:14-25, 105:1-25, 106:1-25, 108:8-25, 110:1-25, 111:1-11, 112:1-25, 120:3-4, 121:1-25, 122:1-25, 125:117-21, 128:1-25, 129:1-25, 130:1-17, 131:12-25*)

7

The patent application the "Abstract" reads:

>"A method for manual intervention in a dialing process includes maintaining a list of records containing phone numbers in a database stored on a computer readable storage medium, receiving at a computer and from the user a click for each of the records within the list of records in the database stored on the computer readable storage medium, and storing on a computer readable storage medium a record of the click, an identity of the user performing the click, and an association between the click and one of the records within the list of records. For each click, the method provides for electronically communicating the corresponding phone number of one of the records within the list to a dialing device for dialing the phone number. The method may further include dialing the phone number using the dialing device." (*Exhibit P - CBE patent application p. 1*)

Note, "The method may further include dialing the phone number using the dialing device."  The question of Automatic Telephone Dialing System is for the "dialing device" which is not a part of the "clicker" application.

This abstract is defining a program that adds a column to a table of phone numbers within a database and places a value in that column indicating that a user clicked a button.  Figure 1A of the application shows that a click is recorded into the list, a comment is added, and the resulting number is passed to the dialing device (*See Exhibit P - CBE patent application – Figure 1A*).  My interest in this case is the "dialing device" which is not a part of the "clicker" application.

Figure 1B of the patent application for the "clicker" application shows the "clicker" application as a web based UI interacting with the database in which it is manipulating. Outside of that is the dialing system (*See Exhibit P - CBE patent*

8

*application – Figure 1B).*  A typical predictive dialer, or any automatic telephone dialing system, has several components to make up the storage of the list and the calling of the list.  There is the database or list of numbers to call, the connection to a telephone carrier, and the terminal which the operator sits at with a headset or telephone.  The database, the dialer, and the terminal may be on the same computer or may be spread across several computers working together as one system.  I will illustrate in this case, the "dialing" device contains all the capabilities of either storing or generating a list of numbers and calling those numbers on it's own without the use of the "clicker" application.  This illustration, Figure 1B, shows that the dialer is in no way connected with the "clicker" application, but that the dialer will call whatever numbers are passed to it from the "clicker" application. (*See Exhibit P - CBE patent application - Figure 1B*).

The patent application, Figures 2, 3 and 4 show that the user will select a list of numbers – contained in a database, click until all the records have an entry of the user's clicks, then the user will repeat this process for other lists.  This process is described in detail in paragraphs 0016, 0044, 0048-0050.  (*See Exhibit P - CBE patent application Figures 2, 3, 4 and  ¶¶ 0016, 0044, 0048-0050*)

Figures 5A, 5B, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20 of the patent application for the "clicker" program has a series of what the user would be presented with on the screen of his/her computer.  As illustrated, no screen of this application has anything with the initiating of telephone calls further indicating that this application is not the system that actually places a telephone call (*See Exhibit P - CBE patent application Figures 5A, 5B, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20*).

Paragraph 0044 makes very clear that this "clicker" application does not initiate phone calls:

9

"… The manual dial application allows for a human being to enter unauthorized cell phone numbers into a list by clicking on an icon, … Once selected by the user through the clicking process, each of the cell phone numbers may then be dialed. The manual clicker application is preferably dialing device agnostic." (*See Exhibit P - CBE patent application page ¶ 0044*)

The user clicks each phone number, passing the phone number to the "dialing device."  The "clicker" program is not associated with the dialer, in fact, it is "dialer agnostic."  This "clicker" program is simply a program to provide the same interface to calling agents whether they use the Noble Systems predictive dialer or the Livevox HCI dialer as highlighted by Terry Johnson.  (*See Exhibit R - Deposition transcript of Terry Johnson p. 116:14-18*)  Highlighting that clicking numbers in this "clicker" application does not initiate phone calls (*See Exhibit P - CBE patent application ¶ 0044*).  In paragraph 0057 on page 27, the applicant points out that while waiting for a call to come through, a user can spend that idle time clicking.  The applicant points out that the person clicking does not need to be anywhere near a telephone or dialing system (*Exhibit P - CBE patent application ¶ 0057*).

This "clicker" program by itself is not an ATDS because it does not initiate phone calls.  If I were to relate the "clicker" application to something more familiar such as a cell phone, the "clicker" application would be the bluetooth earpiece.  To say that the "clicker" application is the dialing device would be the same as saying the bluetooth earpiece is the phone because one could press the button on it to call the last number.  The reality is neither the earpiece nor the "clicker" application are connected to the phone service provider and provide nothing more than a human interface to the actual phone system.  In this case, the "clicker" application selects the phone number and the dialer will dial the phone

10

number.  The system at issue, in this case, is the system that calls the phone numbers, not the "clicker" application.

During his deposition, Terry Johnson, attempted to cause confusion in this area by redefining the "clicker" application as the "dialing device" and the Noble Systems dialer and Livevox dialer as the "carrier." (*See Exhibit R - Deposition transcript of Terry Johnson pp. 23:25, 24:1-4, 61:8-25, 62:1-25, 108:8-25, 109:1-25, 111:1-11, 122:10-18, 122:24-25*).  In my previous example, that would be the same as calling the bluetooth earpiece the "phone or dialing device", the phone itself calling it the "carrier"  But doing so would require leaving Sprint or AT&T out of the picture – who is really the "carrier."  For the last 16 years, I have worked with "autodialers" and have only seen names used by those in the industry to be "Automatic Telephone Dialing System" or "autodialer" for short, and "predictive dialer" for a specific type of "autodialer."  I have never seen the name "carrier" attributed to any type of phone system, but that name was reserved for the phone company, as Merriam-Webster defines "carrier" - "a telecommunication company."  I will note that during his deposition, Terry Johnson admitted that the "clicker" application is not a phone system. (*See Exhibit R - Deposition transcript of Terry Johnson pp. 61:16*)  I would also note that when referring to landline calls, Terry Johnson referred to the Noble Systems and Livevox dialers as a "dialing device" (*See Exhibit R - Deposition transcript of Terry Johnson pp. 14:15-21, 16:9-17, 20:17-21, 21:25, 22:1-25, 23:1-11, 25:25, 26:1, 121:3-25*), but when referring to cell phone calls, he attributed "dialing device" to the "clicker" application although the calls were still made through the Noble or Livevox dialers making Noble Systems and Livevox dialers the "carrier." (*See Exhibit R - Deposition transcript of Terry Johnson pp.  61:17-25, 108:8-25, 110:1-25, 111:1-11, 122:10-25*)  The Noble Systems predictive dialer is a predictive dialer regardless of the human interface device used to

11

interact with that dialer.  A typical operation of the Noble Systems predictive dialer uses either a physical telephone with a handset or a headset attached to the computer and a software interface to interact with the dialer.  Changing that interface to a "clicker" application changes nothing about the Noble Systems predictive dialer.  The same applies to the Livevox dialers.

The CBE group uses three Livevox dialers and one Noble Systems dialer, all of which I am very familiar with.  (*See Exhibit R - Deposition transcript of Terry Johnson pp. 16:17, 19:22:24, 20:17-21, 22:4-12, 23:9-20, 25:25, 26:1-15, 61:4-5, 101:20-25, 102:1-2, 103, 10-25, 104:14-25, 105:1-25, 106:1-25, 108:8-25, 110:1-25, 111:1-11, 112:1-25, 120:3-4, 121:1-25, 122:1-25, 125:117-21, 128:1-25, 129:1-25, 130:1-17, 131:12-25*)  I am familiar with the products provided by Livevox.  Livevox has four dialers: HCI, Manual, Preview-all and Automated.  Each of these four dialers are separated and do not interact with each other.  Terry Johnson confirmed that CBE uses three of the four Livevox products: Manual, Automated ("Outbound"), and HCI (*See Exhibit R - Deposition transcript of Terry Johnson pp. 128:13-25, 129:1-25, 130:1-17*)  Of the three Livevox dialers, Automated ("Outbound") is the only predictive dialer. Terry Johnson also confirmed that CBE uses the Noble Systems predictive dialer. (*See Exhibit R - Deposition transcript of Terry Johnson pp. 16:9-17, 19:11-24, 20:17-21, 21:9-25, 22:1-20, 23:9-11, 25:25, 26:1-15, 61:4-5, 103:10-25, 104:14-25, 105:7-25, 106:1-25, 108:8-25, 110:1-25, 111-1-11, 112:1-16*)  Terry Johnson also confirmed that the Noble Systems dialer is a predictive dialer (*See Exhibit R - Deposition transcript of Terry Johnson pp.  24:12-21, 113:22-25, 114:1-9*)

The CBE Group called the phone number ending in 4379 a total of 26 times. (*See Exhibit R - Deposition transcript of Terry Johnson pp. 54:7-13; Exhibit Q - Account Notes*).  The calls on 04-14-2014 and 04-15-2014 were made through the predictive dialer and dialed predictively. (*See Exhibit R - Deposition*

12

*transcript of Terry Johnson pp. 75:8-17, 76:11-16, 104:8-12; Exhibit Q - Account Notes p. 9*).

All the calls from 04-14-2014 to 06-04-2014 where manually dialed through the Noble Systems predictive dialer (*See Exhibit R - Deposition transcript of Terry Johnson 104:14-25, 105:1-25, 106:1-25; Exhibit Q - Account Notes*)

All the calls from 06-12-2014 onward where made using the Livevox HCI dialer (*See Exhibit R - Deposition transcript of Terry Johnson pp. 105:12-14; Exhibit Q - Account Notes; Exhibit S - Response from Livevox*)

While The CBE Group uses three dialers from Livevox (*See Exhibit R - Deposition transcript of Terry Johnson pp. 128:13-25, 129:1-25, 130:1-17*), the one Livevox dialer used to call the phone number ending in 4379, Livevox HCI, is not an ATDS.  Therefore I will limit my opinion to the Noble Systems predictive dialer.

To determine which calls were made using the Noble Systems predictive dialer, I first compared the Livevox HCI dialer records with the account notes to identify which calls were placed with the Livevox HCI dialer. (*See Exhibit S - Response from Livevox; Exhibit Q - Account Notes*).  Terry Johnson testified in his deposition that all the calls from June 12, 2014 onward were placed using the Livevox HCI dialer, and all the calls before June 12, 2014 were placed with the Noble Systems predictive dialer. (*See Exhibit R - Deposition transcript of Terry Johnson pp. 103:10-25, 104:8-25, 105:1-25, 106:1-25, 108:8-25, 110: 1-25, 111:1-11, 112:1-16, 114:1-19*)  This was verified with Livevox dialing records (*See Exhibit S - Response from Livevox*)  The following 18 calls, at issue, were placed with the Noble Systems predictive dialer:  04/14/14 at 2244, 04/14/14 at 1456, 04/15/14 at 1238, 04/18/14 at 1124, 04/19/14 at 839, 04/21/14 at 1107, 04/22/14 at 1501, 04/22/14 at 944, 04/23/14 at 937, 04/28/14 at 921, 04/30/14 at

13

1131, 05/05/14 at 809, 05/08/14 at 1254, 05/12/14 at 1417, 05/15/14 at 1308, 05/20/14 at 1636, 05/29/14 at 1926, 06/04/14 at 1850.

Based upon the documents and evidence I have reviewed, all the calls at issue that were made to Plaintiff using the Noble Systems Predictive Dialer.  As explained further below, in my expert opinion, this dialing system satisfies the requirements of an "automatic telephone dialing system" ("ATDS") as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA").

Noble Systems PDS is a predictive dialer that, like other predictive dialers, calls lists of numbers organized as "campaigns." Noble PDS is the predictive dialer itself, Noble IVR is the interactive voice response system as an optional add on, Noble Messenger gives Noble PDS the ability to send pre-recorded messages to telephone numbers, and Noble Maestro is the software to manage the calling lists and dialer. (*See Exhibit C – Noble Systems - Management Desktop; Exhibit D - Noble Systems - IVR; Exhibit E - Noble Systems - Messaging; Exhibit F - Noble Systems - Outbound; Exhibit R - Deposition transcript of Terry Johnson pp.  24:12-21, 113:22-25, 114:1-9*) The Noble Systems predictive dialer is capable of dialing a list of numbers loaded into a "campaign" or "pool"[1] on the dialer.  The Noble Systems predictive dialer then can automatically dial those numbers and deliver predictive dialed calls or agent-less calls delivering pre-recorded messages. (*Id.*) For predictive dialed calls, the Noble Systems predictive dialer will call using multiple telephone lines per agent, and it will use all available telephone lines when making agent-less calls. (*Id.*)  All phone calls, regardless of how dialed are called using the same equipment, terminials, phone, PBX, and Noble Systems predictive dialer before going to the PSTN (public switched telephone network). (*Id.*)

---

[1] A "pool" is, like a "campaign," in that it is calling a list of phone numbers organized by some predefined criteria for a specific purpose.

After reviewing the above documents, and based on my experience with predictive dialers and autodialers, I am of the opinion that Defendant used an Automatic Telephone Dialing System to place telephone calls to Plaintiff, or more specifically, that the characteristics of the telephone dialing system described above meet the definition of equipment that has the capacity to store or produce numbers to be called, using a random or sequential number generator, and the capacity to call such numbers. Specifically, the dialer calls numbers that are stored as a list, which itself is stored in a table of a database.

The term "Predictive dialer" is a technical term used to describe the type of dialing system.  Predictive dialers all work under the same guiding principle: they transfer telephone numbers to be called to a list or "campaign."  This list of numbers is then dialed without human intervention. The calls are made, using multiple telephone lines, in advance of being connected to a live operator.  Using a complex computer algorithm, the dialing system will "predict" how far in advance to make the calls in attempt to prevent time wasted in listening to rings, answering machines, disconnected phone numbers and calls that are not answered.  This functionality has not changed since Davox marketed their predictive dialers in the 1980's. (*See Exhibit M - Davox Marketing*)

The term "Predictive dialer" was not created by the FCC in their 2003 Order.  Nor was the term "automatic telephone dialing system" created by Congress.  These are terms that have been used to describe such equipment, by those in the industry for decades.  Norman A. Sheldon filed a patent (*Exhibit I - US patent 3,943,289*) on  July 12, 1974 for what he called a "automatic telephone dialing system" (*Exhibit I - US patent 3,943,289 page 4 column 2 line 63*) which dialed numbers from a sequential number generator and delivered pre-recorded messages to telephone subscribers. He chose to use a sequential number generator because at that time computer storage was very expensive (*Exhibit F -*

15

*U.S. Patent  3,943,289 page 4 column 2 lines 2-11*).  Although he chose to use a sequential number generator, stored lists of numbers had been used for many years prior to his patent. (*See Exhibit N - US Patent 3229042; Exhibit O - US Patent 3317678*)  In  July 25, 1989, Bassem M. Girgis filed a patent (*Exhibit J - US patent 4,933,964*) for a "predictive outbound dialing system" (*Exhibit J - US patent 4,933,964 page 19 column 2 line 53*) which used an "input call list" (*Exhibit J - US patent 4,933,964 figure 3*) stored in the system to call those numbers in advance predicting when a live agent would be available using a predictive algorithm.  This system was designed to call out on more lines than available agents from a list of numbers, listen for rings, busy, and answered calls, and connect the calls to agents by predicting when they would be available.  This is the precise capability of the Predictive dialers used today and the Noble Systems predictive dialer used by The CBE Group, Inc.  The functionality of the autodailers and predictive dialers has not changed since long before the TCPA until now with the exception that modern dialers can make more calls in a shorter period of time.  Attached as Exhibit L are examples of articles and job postings illustrating that the exact same type of equipment was used over the last four decades, along with the terms "Automatic Telephone Dialing System" and "Predictive Dialer," long before Congress or the FCC considered the equipment. (*See Exhibit L - ATDS and predictive dialers 1970-1992; also see Exhibit U - FCC response to ACA pp. 13-14 footnote 3*)  The equipment described in the TCPA and the FCC 2003 Order is the same equipment that is in use today and used by The CBE Group, Inc.

The fact that the dialer places calls to numbers stored by the dialing system and delivers predictive dialed calls indicates that the dialer meets the definition of an ATDS, as it relates to predictive dialers, as clarified in the Federal Communications Commission's ("FCC") 2003 Order:

16

The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.  As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.  The principal feature of predictive dialing software is a timing function, not number storage or generation. ...[T]hese machines are not conceptually different from dialing machines without the predictive computer program attached."

….

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "capacity to store or produce telephone numbers (emphasis added). . .." It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop.

….

[T]o exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result. ...We believe the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress.

17

(*Exhibit B - FCC Order 03-153 ¶¶ 131-134 (finding that a predictive dialer falls within the TCPA's definition of "automatic telephone dialing system").*)

The FCC 2008 Order resulted from a petition by a consortium of debt collectors to the FCC requesting that the FCC reconsider its 2003 Order. In response, the FCC affirmed the 2003 Order. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, FCC Docket No. 07-232.

Additionally, the properties of the dialing system have the precise capabilities of an ATDS as further clarified by FCC Order 12-56 (May 21, 2012), wherein, the FCC stated:

> Under the TCPA, the term "automatic telephone dialing system" is defined as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id*. at § 227(a)(1). The Commission has emphasized that this definition covers any equipment that has the specified capacity to generate numbers and dial them without human intervention whether or not the numbers called are randomly or sequentially generated or come from calling lists.
>
> *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014 at 14092 ¶ 133 (2003).

Thus, in my expert opinion, the dialing system (as outlined above) constitute an ATDS as contemplated by the TCPA and clarified by the FCC, because the systems have the capacity to either call numbers stored or to call numbers generated by a number generator:

18

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have "the *capacity* to store or produce telephone numbers (emphasis added)…."

(*See Exhibit B - FCC Order 03-153 at ¶ 132*).

A predictive dialer has the capacity of an ATDS, not because it predicatively dials calls, but simply that it has the capacity to automatically call numbers stored in a list. The predictive algorithm in a predictive dialer predicts when agents would be available and is no way related to the storage or production of numbers. With all the predictive dialers with which I have worked in the last 15 years, the predictive algorithm was in no way related to the storage or production of numbers. The FCC correctly stated this, "The principal feature of predictive dialing software is a timing function, not number storage or generation." (*See Exhibit B - FCC Order 03-153 ¶ 131*)

All predictive dialers are indeed an ATDS, but not all ATDS's are predictive dialers. As the FCC stated, "The principal feature of predictive dialing software is a timing function, not number storage or generation.... [T]hese machines are not conceptually different from dialing machines without the predictive computer program attached." (*See Exhibit B - FCC Order 03-153 ¶ 131*). I myself use the example of predictive dialers when explaining what capacities are in view in the FCC 2003 Order. I do this because there are many more features than just storing numbers in a list and automatically calling them, and using the example of the predictive dialer I can highlight that none of those other features have anything to do with computer storage or the generation of numbers. Systems that only call lists of numbers to deliver a pre-recorded

19

message or systems that call numbers to deliver a text or SMS message have no live agents involved, therefor there is little confusion on their capacity to store or produce numbers and to call them. But all those other features in a predictive dialer are in addition to storing numbers and automatically calling them.  Other features found in predictive dialers such as ACD routing, AMD detection, preview mode and other dialing modes, predictive algorithms, abandon rate, cloud based, skills based routing, blended campaigns, CRM integration, types of databases used by the system, VoIP, POTS lines, T1 lines, PRI lines, operating systems, computer hardware all have nothing to do with the systems capacity to store a list of numbers and to automatically call them.  For these reasons, I use the example of predictive dialers to explain what features make it an ATDS, because at the same time I can explain what features do not make it an ATDS.

It is my understanding that The CBE Group, Inc. placed calls to the Plaintiff in both predictive mode and manual mode.  (*See Exhibit R - Deposition transcript of Terry Johnson p. 75:8-17, 114:1-9*)  The mode of operation however does not change the capacity of the system.  Changing the mode of dialing is done by clicking a radio button and clicking "save."  The FCC considered this when clarifying "capacity."  (*See Exhibit U - FCC response to ACA pp. 31-36*) The administrator of a predictive dialer is not capable of taking away any functionality of the system.  The administrator can only choose to not use it.  The fact that one campaign can be configured to use preview mode and another campaign configured to use predictive, while other agents place calls manually, all occurring at the same time, illustrates the system has the current capacity regardless of the dialing mode selected for a particular campaign.

All Predictive Dialers, which I have seen, also employ a "manual" mode and a "preview" mode, which presents the calling agent with information about the to-be-called party before the number is actually dialed. The agent then has the

20

ability to accept that lead based on the information presented, or reject it and await the dialer to present a new lead to be called. Because a dialer has a preview mode or a manual mode and the calling party may have used those modes, however, does not mean that the dialer fails to qualify as an ATDS.

I am not alone in my understanding of whether manual mode has any effect on the capacity of the predictive dialer.  Recently, Ontario Systems (the creators of the popular Guaranteed Contacts predictive dialer and the FACS system) published a two part article on the subject of dialing modes and their impact on the predictive dialer's capacity as defined by the FCC.  Using the example of manually dialed calls through the predictive dialer, Ontario Systems highlights that a Predictive dialer is a predictive dialer regardless how it is used. Manually dialed is when one presses all ten digits of the phone number to place the call, not a number stored on the list.  Preview mode calls the numbers from the list stored in the predictive dialers database.  The FCC clarified that predictive dialers are an ATDS because of their capacity not how the operator uses it.  The two articles from Ontario Systems are relevant in their entirety (*See Exhibit G - The Big 2 Myths You Probably Believe About Manual Dialing - Part 1;  Exhibit H - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2*), however, the summary highlights the main point:

> In other words, if the technology you use to contact consumers has any capacity to dial predictively, or pull from a database of numbers and dial them, current judicial opinion indicates it is an autodialer.  Period. This is true whether you launch the call manually by pressing a field, or if you enter 10 digits on a keypad. On the other hand, it opined such a call is a manual dial if it's made using a system to contact consumers that is not tied, routed from or

21

to, or in any way connected to your autodialer. If it's not, it is unlikely you are contacting consumers using an automatic telephone dialing system as defned by the FCC. (*Exhibit H - The Big 2 Myths You Probably Believe About Manual Dialing - Part 2*)

In other words, to call cell phones, one should use a separate PBX entirely.

Another manufacturer of a popular predictive dialer agrees, which is also the manufacturer of the predictive dialer used by The CBE Group, Inc. Sighting the Nelson decision, Noble Systems does offer a solution which routes calls to wireless numbers through a separate PBX entirely. (*See Exhibit K - Noble TCPA Compliance Solution*) There is no indication however that the The CBE Group, Inc. had such a solution in place. On the contrary, all "manual" and preview calls are still going through the Noble predictive dialer. (*See Exhibit R - Deposition transcript of Terry Johnson pp. 103:10-25, 104:8-25, 105:1-25, 106:1-25, 108:8-25, 110: 1-25, 111:1-11, 112:1-16, 114:1-19*)

As stated above, the FCC relies upon the following definition of an "automatic telephone dialing system":

> The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." The statutory definition contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have "the capacity to store or produce telephone numbers (emphasis added)…."

22

(*See Exhibit B - FCC Order 03-153 at ¶ 132*).   This definition is consistent with the definition used by those in the industry long before adopted by Congress or the FCC.

Even more recently, July 10, 2015, the FCC issued a Declaratory Ruling and Order in which the FCC clarified the term "capacity," whether the system needs to have currently installed ability to generate numbers sequentially or randomly, whether calling from a predetermined list of consumers satisfies the statute, whether multiple systems making up the entire dialing system are viewed individually or as a complete system, and whether the system system needs to be operated using such capacity to be considered an autodialer.   While the Defendant's system has the current "capacity" to automatically dial a list of numbers, the FCC, in their July 10, 2015 Declaratory Ruling and Order, the FCC has taken the more broader understanding of the term capacity to include systems that could have the capacity added easily:

> We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of "autodialer") even if it is not presently used for that purpose, including when the caller is calling a set list of consumers. We also reiterate that predictive dialers, as previously described by the Commission, satisfy the TCPA's definition of "autodialer" for the same reason. We also find that callers cannot avoid obtaining consent by dividing ownership of pieces of dialing equipment that work in concert among multiple entities.

23

Glide, PACE, and TextMe ask whether dialing equipment is an autodialer under the TCPA when it does not have the "current capacity" or "present ability" to generate or store random or sequential numbers or to dial sequentially or randomly at the time the call is made. Glide asks the Commission to clarify that "equipment used to make a call is an autodialer subject to the TCPA only if it is capable of storing or generating sequential or randomized numbers at the time of the call." PACE seeks clarification that a dialing system's "capacity" is "limited to what it is capable of doing, without further modification, at the time the call is placed." TextMe asks the Commission to clarify that "capacity" "encompasses only equipment that, at the time of use, could in fact perform the functions described in the TCPA without human intervention and without first being technologically altered."

The TCPA defines "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." In the 2003 TCPA Order, the Commission found that, in order to be considered an "automatic telephone dialing system," the "equipment need only have the 'capacity to store or produce telephone numbers.'" The Commission stated that, even when dialing a fixed set of numbers, equipment may nevertheless meet the autodialer definition.

In the 2003 TCPA Order, the Commission described a predictive dialer as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The

24

hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." In the 2008 ACA Declaratory Ruling, the Commission "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." The Commission considered ACA's argument that a predictive dialer is an autodialer "only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists," and stated that ACA raised "no new information about predictive dialers that warrant[ed] reconsideration of these findings" regarding the prohibited uses of autodialers—and therefore predictive dialers—under the TCPA.

The Commission declined to distinguish between calls to wireless telephone numbers made by dialing equipment "paired with predictive dialing software and a database of numbers" and calls made "when the equipment operates independently of such lists and software packages." Recognizing the developments in calling technology, the Commission found that "[t]he basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention." The Commission found it troubling that predictive dialers, like dialers that utilize random or sequential numbers instead of a list of numbers, retain the capacity to dial thousands of numbers in a short period of time and that construing the autodialer definition to exclude predictive dialers could harm public safety by allowing such equipment to be used to place potentially large numbers of non-emergency calls to emergency

numbers, a result the TCPA was intended to prevent. The Commission concluded that the TCPA's unqualified use of the term "capacity" was intended to prevent circumvention of the restriction on making autodialed calls to wireless phones and emergency numbers and found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."

We agree with commenters who argue that the TCPA's use of "capacity" does not exempt equipment that lacks the "present ability" to dial randomly or sequentially. We agree that Congress intended a broad definition of autodialer, and that the Commission has already twice addressed the issue in 2003 and 2008, stating that autodialers need only have the "capacity" to dial random and sequential numbers, rather than the "present ability" to do so. Hence, any equipment that has the requisite "capacity" is an autodialer and is therefore subject to the TCPA.

In the 1992 TCPA Order, the Commission stated that it was rejecting definitions that fit "only a narrow set of circumstances" in favor of "broad definitions which best reflect[ed] legislative intent by accommodating the full range of telephone services and telemarketing practices." The Commission rejected the narrower interpretation of "capacity" (as "current ability") when it held that predictive dialer equipment meets the autodialer definition. In the 2003 TCPA Order, the Commission held that predictive dialers met the definition of an autodialer because that "hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a

26

database of numbers." By finding that, even when the equipment presently lacked the necessary software, it nevertheless had the requisite capacity to be an autodialer, the Commission implicitly rejected any "present use" or "current capacity" test. In other words, the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities. One dissent argues that our reading of "capacity" is flawed in the same way that saying an 80,000 seat stadium has the capacity to hold 104,000. But that is an inapt analogy—modern dialing equipment can often be modified remotely without the effort and cost of adding physical space to an existing structure.  Indeed, adding space to accommodate 25 percent more people to a building is the type of mere "theoretical" modification that is insufficient to sweep it into our interpretation of "capacity."

Given the scope of the Petitioners' requests, we do not at this time address the exact contours of the "autodialer" definition or seek to determine comprehensively each type of equipment that falls within that definition that would be administrable industry-wide. Rather, we reiterate what the Commission has previously stated regarding the parameters of the definition of "autodialer." First, the Commission found in its original TCPA proceeding that the "prohibitions of [section] 227(b)(1) clearly do not apply to functions like 'speed dialing.'" Second, the Commission has also long held that the basic functions of an autodialer are to "dial numbers without human intervention" and to "dial thousands of numbers in a short period of time." How the human intervention element applies to a particular piece of equipment is specific to each individual piece of

27

equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.

We do, however, acknowledge that there are outer limits to the capacity of equipment to be an autodialer. As is demonstrated by these precedents, the outer contours of the definition of "autodialer" do not extend to every piece of malleable and modifiable dialing equipment that conceivably could be considered to have some capacity, however small, to store and dial telephone numbers—otherwise, a handset with the mere addition of a speed dial button would be an autodialer. Further, although the Commission has found that a piece of equipment can possess the requisite "capacity" to satisfy the statutory definition of "autodialer" even if, for example, it requires the addition of software to actually perform the functions described in the definition, there must be more than a theoretical potential that the equipment could be modified to satisfy the "autodialer" definition. Thus, for example, it might be theoretically possible to modify a rotary-dial phone to such an extreme that it would satisfy the definition of "autodialer," but such a possibility is too attenuated for us to find that a rotary-dial phone has the requisite "capacity" and therefore is an autodialer.

This broad interpretation of "capacity" to include "potential ability" is consistent with formal definitions of "capacity," one of which defines "capacity" as "the potential or suitability for holding, storing, or accommodating." Furthermore, interpreting "capacity" as limited to "current capacity" or "present ability," for which Petitioners and some commenters here argue, could create problems for enforcing the TCPA's privacy protections with regard to proving

28

how a system with multiple functions was actually used for multiple calls. As the Commission has previously recognized, "the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the restriction on autodialed calls not be circumvented."

In light of our precedent and determination that Congress intended a broad definition of autodialer, we reject arguments that: the TCPA's language on its face does not support the claim that the TCPA was meant to apply to devices that need to be configured to store numbers or call sequentially; a narrow reading of the TCPA is necessary to eliminate a lack of clarity regarding what constitutes an autodialer; and the term "capacity" implies present ability rather than future possibility. We reiterate that a present use or present capacity test could render the TCPA's protections largely meaningless by ensuring that little or no modern dialing equipment would fit the statutory definition of an autodialer. We also reject PACE's argument that the Commission should adopt a "human intervention" test by clarifying that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention.  Because the Commission has previously rejected a restrictive interpretation of autodialer in favor of one based on a piece of equipment's potential ability, we find that PACE's argument amounts to a simple variation on the "present ability" arguments we reject above.

PACE, TextMe, and others argue that a broad interpretation of "capacity" could potentially sweep in smartphones because they may have the capacity to store telephone numbers to be called and to

29

dial such numbers through the use of an app or other software. Even though the Commission has interpreted "capacity" broadly since well before consumers' widespread use of smartphones, there is no evidence in the record that individual consumers have been sued based on typical use of smartphone technology. Nor have these commenters offered any scenarios under which unwanted calls are likely to result from consumers' typical use of smartphones. We have no evidence that friends, relatives, and companies with which consumers do business find those calls unwanted and take legal action against the calling consumer. We will continue to monitor our consumer complaints and other feedback, as well as private litigation, regarding atypical uses of smartphones, and provide additional clarification if necessary.

Because our decision is based on the TCPA's terms and past Commission interpretation, we need not reach the policy arguments from Glide and other commenters, such as claims related to class-action lawsuits, that could be viewed as being offered to support reversing the Commission's prior decisions; in a declaratory ruling we only clarify existing law or resolve controversy regarding theinterpretation or application of existing law, rules, and precedents.

We also find that parties cannot circumvent the TCPA by dividing ownership of dialing equipment. In their Petition, Fried and Evans seek a ruling that a combination of equipment used by separate entities to send text messages constitutes an autodialer under the TCPA. The Petitioners in this case received text messages from a beauty salon that had contracted with another party,

30

Textmunications, Inc. (Textmunications), to transmit advertisements in the form of text messages to their current and former customers. Textmunications, in turn, contracted with Air2Web, a mobile messaging aggregator, to transmit the messages. As described in the Fried Petition and the Referral Order, the beauty salon provided customer data to Textmunications, who stored this information on its own equipment and databases. Textmunications then entered into an agreement with Air2Web to use its equipment to transmit the text messages to the recipients. 84 In effect, the separate equipment divided the storage and calling functions between these two companies. As a result, Air2Web and Textmunications allege that their equipment should not be considered an autodialer because neither system, acting independently, has the capacity both to store or produce numbers, and dial those numbers as required by the TCPA.

We conclude that such equipment can be deemed an autodialer if the net result of such voluntary combination enables the equipment to have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. The fact that two separate entities have voluntarily entered into an agreement to provide such functionality does not alter this analysis. As one commenter notes, this conclusion is consistent with the statutory language and prior Commission interpretations of the TCPA. The TCPA uses the word "system" to describe the automated dialing equipment that is defined in section 227(a)(1) of the Act. The Commission noted, in concluding that a predictive dialer meets the definition of an

31

autodialer, that "[t]he hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers." As a result, the Commission has recognized that various pieces of different equipment and software can be combined to form an autodialer, as contemplated by the TCPA. The fact that these individual pieces of equipment and software might be separately owned does not change this analysis.

(*See Exhibit T - FCC-15-72A1 ¶¶ 10-24*)

Previously I have held a more narrow definition of "capacity" in regards to the generation of phone numbers, however, that had no effect in determining whether predictive dialers were an ATDS, because predictive dialers retain the capacity to automatically dial a list of numbers regardless of the dialing mode a campaign may be set at.  In light of the FCC's July 10, 2015 Declaratory Ruling and Order where they take a broad definition of "capacity" as it relates to autodialing numbers and the generation of numbers, I would point out that making a computer generate a list of 10 digit numbers, is a relatively trivial task. Computers are designed to do math and counting i.e. "to compute."  For example, typing "seq 6192486000 6192486999 > sequential_numbers_to_call.txt" creates a list of 1000 Sprint Wireless Numbers to be called (this was done on my regular laptop with no additional software installed.  In other words, my laptop running Linux has natively installed a "sequential number generator" that can produce a list of phone numbers.   Windows computers have a similar command line function as well.  Typing "for /L %i in (2480000,1,2489999) do @echo 619%i >> sequential_numbers_to_call.txt" generates the same list on a Windows computer. The Noble systems predictive dialer runs on Windows and therefore has a sequential number generator.  Of course storage of numbers does not discriminate

32

on how the numbers were produced as computer storage can store any kind of data regardless of how it was produced whether loaded from a list of known numbers or a list of sequentially generated numbers. (*See Exhibit U - FCC response to ACA pp. 6, 12, 13, 24, 36, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 52*)

Those FCC orders and rulings provide me with the information that assists me in forming an opinion about whether The CBE Group's system has the capacity as required by the TCPA's definition of an ATDS. Based on those orders and rulings, based upon my review of the documents and evidence provided in this case, based on my knowledge of computer storage and computer processing, and based on my knowledge of autodialers and predictive dialers, it is also my expert opinion that all of the calls, at issue, made to Plaintiff in this case were made using an automatic telephone dialing system.

The process of analyzing the Noble Systems predictive dialer used  was a simple process.  To satisfy the question of whether or not the system has the technical capabilities described in the FCC's clarification of the TCPA in the 2003 report, all I had to do was investigate what the dialing equipment is capable of doing, and using my knowledge of predictive dialers, determine if in fact those capabilities are indeed those defined in the 2003 FCC order.

Additionally, no other physical inspection was required in determining the capabilities of these systems.  The physical attributes of the systems have nothing to do with the functionality of the system.  A physical inspection of these systems would not show anything more than the predictive dialer is a standard computer in which I have over two decades of experience with.

After studying the manuals for the Noble Systems predictive dialer and my own experience with predictive dialers and my experience with Noble Systems, I had far more knowledge than what was required to make an informed and

*STRAUSS v. THE CBE GROUP, INC.*
WRITTEN REPORT OF JEFFREY A. HANSEN

reliable determination of whether or not the system was able to store numbers and call them automatically, or whether the system can generate numbers and call them automatically. In the case of the Noble Systems predictive dialer used by The CBE Group, the system is capable of doing both.

In this case, the Noble Systems predictive dialer has the capacity to store those numbers in a database and call them without human intervention, even if the operator of the computer walks away, the dialer would continue to make those calls; and it will continue to make those calls until the list of phone numbers is exhausted. All that was required was a simple and short process to determine if the dialer had such capabilities. I have studied the manual, for the Noble Systems predictive dialer to obtain a full understanding of the dialer, however, all that study goes far beyond answering the pertinent questions of whether or not the predictive dialer stores or produces numbers and calls them automatically.

*Additional Work and Analysis.*

Additionally, I will be examining future discovery responses and will be formulating additional expert opinions on the topics raised in those discovery responses as requested and appropriate.

I reserve the right to amend, modify or supplement the statements and opinions set forth herein as appropriate.

I declare that the foregoing is true and correct, subject to the laws of perjury of the United States. Executed in Spring Valley, CA on this 29th day of January 2016.

_____

Jeffrey A. Hansen

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*STRAUSS v. THE CBE GROUP, INC.*
WRITTEN REPORT OF JEFFREY A. HANSEN